# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL DELKER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 09-710 |
| | ) | |
| v. | ) | Magistrate Judge Bissoon |
| | ) | |
| CORRECTIONS OFFICER BLAKER, *et al.*, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons that follow, the motion for summary judgment filed by Defendant Grainey (Doc. 60) will be denied.

Daniel Delker ("Plaintiff") is a state prisoner currently incarcerated at the State Correctional Institution at Fayette ("SCI-Fayette"), located in LaBelle, Pennsylvania. Plaintiff brings this suit pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging deprivations of his rights under the Eighth Amendment to the Constitution of the United States stemming from events that took place during his transfer from the State Correctional Institution at Somerset ("SCI-Somerset") to the State Correctional Institution at Greene ("SCI-Greene") in Waynesburg, Pennsylvania. Second Am. Compl. (Doc. 35) ¶¶ 1, 10. This suit commenced with this Court's receipt of the initial complaint on June 3, 2009. (Doc. 1). Plaintiff consented to the jurisdiction of a magistrate judge on May 4, 2010. (Doc. 36). Defendants consented to the same on September 10, 2009 (Doc. 11), and June 16, 2010 (Doc. 41).

Defendant Grainey filed a motion for summary judgment (Doc. 54) on November 26, 2010. Plaintiff filed a response to this motion on January 14, 2011 (Doc. 64). Defendant Grainey replied thereto on January 28, 2011 (Doc. 69). This motion is ripe for disposition.

A. **Relevant Factual History**

On June 28, 2008, Plaintiff was being transported from SCI-Somerset to SCI-Greene on a prison bus with other inmates and corrections staff. (Doc. 65) ¶ I.7. During the course of this transportation, Plaintiff was acting in an unruly manner – verbally insulting other inmates and guards on the bus, using racial epithets, and threatening to urinate and spit on his fellow passengers. Id. ¶ I.10. Plaintiff was held in a cage on the bus that separated him from its other passengers, and was restrained with handcuffs, a waist belt, leg shackles, a black box, and a spit hood. Id. ¶¶ I.11, III.1. During the roughly two-hour drive from SCI-Somerset to SCI-Greene, Defendant King was seated behind Plaintiff's cage. Id. ¶ II.11.

As a result of Plaintiff's behavior, Lieutenant Daryl Eperjesi[1] ("Eperjesi") was instructed by the shift commander at SCI-Greene to assemble a crew of corrections officers to remove Plaintiff from the bus when it arrived, and process him into the Restricted Housing Unit ("RHU"). Id. ¶¶ I.8 – I.9.

When the transport arrived at SCI-Greene, all inmates save Plaintiff were removed from the bus and placed in a holding cell in the prison's intake area. Id. ¶ I.13. At some point prior to attempts being made to remove Plaintiff from the bus, Defendant King encountered Defendant Grainey, who is the highest-ranking uniformed corrections officer at the institution, outside of

---

[1] Eperjesi, while initially named as a Defendant to this suit, was dismissed on May 3, 2010, when Plaintiff filed the second amended complaint. (Doc. 35).

2

the intake area.  Id. ¶¶ I.6, I.12.  Both Defendant Grainey and Plaintiff agree that Defendant Grainey "was on a walk through the facility, [and] had gone outside briefly . . . to smoke a cigarette."  Id. ¶ II.5.  It is undisputed that Defendant King informed Defendant Grainey of the problems that he had experienced regarding Plaintiff's disruptive behavior during the trip.  Id. ¶¶ I.12, III.8; (Doc. 65-1) at 108.  Defendants King, Blaker, and Pluck, as well as Plaintiff, assert that during the conversation, Defendant Grainey ordered Defendant King "to do his job" and, if Plaintiff got out of hand, to give him "a good SCI-Greene welcome."  (Doc. 65) ¶¶ I.12, III.8, (Doc. 65-1) at 31.  Defendant Grainey denies that any such statement was made, or that any such order was given by him.  (Doc. 65) ¶¶ II.7 – II.8.  It is undisputed that Defendant Grainey left the area prior to Plaintiff's removal from the bus.  Id. ¶ III.10.

Defendants King, Blaker, and Pluck were chosen as the team to remove Plaintiff from the bus.  Id. ¶ I.13.  Adrian Fauvie ("Fauvie"), a non-party corrections officer who was directed to assist in removing Plaintiff from the bus, followed these individuals with a video camera, under orders from Eperjesi to record the encounter.  Id. ¶ I.14.  Eperjesi was present for the removal, and was outside the back of the bus.  Id.

Defendant King stood directly outside of the cage door, which was located on the "passenger side" of the bus.[2]  Id. ¶ 16.  Defendant Pluck positioned himself behind Defendant King, on the "driver's side" of the bus.  Id.  Defendant Blaker stood in the walkway at the back of the bus, facing Defendant King.  Id.  Defendant King asserts that, after opening the cage door, he reached in to take Plaintiff's arms and move him out of the cage.  Id. ¶ I.17.  Plaintiff then lunged forward, and Defendant King grabbed Plaintiff's jumpsuit and pushed him against the

---

[2] The "passenger side" refers to the right half of the bus when viewed from the frame of reference of anyone entering the bus from its rear door.

3

side of the cage in order to reassert control.  Id.  Before control could be regained, however, Plaintiff lunged again.  Id.  Defendants King, Blaker, and Pluck then recount how it appeared to Fauvie that Plaintiff was going to head-butt Defendant King – although Plaintiff did not actually do so.  Id. ¶ I.18.  These Defendants claim that "Plaintiff's weight, momentum and position of balance, combined with [Defendant] King's and [Defendant] Blaker's weight, caused Plaintiff to go to the ground.  [Defendant] King and [Defendant] Blaker then regained physical control of him."  Id. ¶ I.19.  Defendant King admits that, during the course of the altercation, he struck Plaintiff with his hand three times – once in the face while restraining him against the cage, once in the chest before Plaintiff fell to the floor of the bus, and once more while Plaintiff was on the floor.  Id. ¶ I.20.  However, Defendant King argues that this was done only in self-defense, or in the defense of other corrections officers.  Id.

Plaintiff's recollection of these events differs significantly.  Plaintiff asserts that, as he was being removed from the cage, he was not being physically aggressive, and underscores the fact that he was in full restraints.  Id. ¶ I.18.  Plaintiff also points to Fauvie's deposition testimony, in which Fauvie states that prior statements regarding Plaintiff's alleged attempts to head-butt Defendant King were made under duress.  Id.; (Doc. 65-1) at 68 – 70.  Indeed, Fauvie testified at his deposition that he did not believe that Plaintiff had attempted to head-butt Defendant King, and characterized the use of force that took place that day in the following manner: "[t]hat was not unplanned use of force.  That was [Defendant King's] use of force."  (Doc. 65) ¶ I.18; (Doc. 65-1) at 75 – 76.

Plaintiff further asserts that, during the use of force, he turned to try to "fend off the blows" that he was receiving, and was pushed to the floor by Defendant King.  (Doc. 65) ¶ I.19.  While he was on the floor, Defendant King punched Plaintiff in or around his face with a closed

4

fist, and both Defendants King and Blaker continued to punch him while he was down. Id. Plaintiff further alleges that Eperjesi saw Defendant King take Plaintiff to the ground and punch him in his face with a closed fist. Id. ¶ I.22. Plaintiff does not allege that Pluck was involved in the use of force directly, but instead claims that he failed to intervene and stop Defendants King and Blaker's alleged misuse of force. Id. ¶ I.27.

After the use of force, Defendants King and Blacker lifted Plaintiff to his feet and escorted him off the bus and into the prison's intake area. Id. ¶ I.23.

The parties agree that filming of the removal began at 19:14:36 hours.[3] Id. ¶ 24. Recording suddenly stops at 19:15:10, and starts again at 19:15:55, as Plaintiff is walking down the steps leading out of the bus. The portion of the incident that Fauvie did film begins as Defendants King, Blaker, and Pluck are moving into position to remove Plaintiff from the cage. Plaintiff begins asking a question about a lieutenant (presumably Eperjesi), but the majority of his query is inaudible, and he is not answered by the corrections officers. As the door to the cage is unlocked, Plaintiff rises from his seat. Once the door is opened, Plaintiff slowly shuffles out of the cage. Two corrections officers grasp Plaintiffs upper arms. At 19:14:57 Plaintiff utters "ahh, okay," and is roughly shoved into the open cage door. Plaintiff and the door both loudly

---

[3] The timestamp on the video is not in military time. However, in order to remain consistent with the parties' filings, this Court will report all times in military time.

The recording filed with this Court under seal begins at 19:14:42. The video was filed under seal pursuant to a confidentiality agreement between Plaintiff and the Department of Corrections ("DOC"). (Doc. 63-1). The rationale for the agreement was based on the DOC's policy "not to disseminate video records which reveal the inside/layout of its state correctional institutions . . . ." Id. at 2. Given that this Court's description of the contents of the video does not extend to the portions of the video that show the inside of SCI-Greene, and the subject matter is discussed in great detail in filings in this case that are available to the public, this Court will not file this opinion, or any portion thereof, under seal.

5

collide with the outer wall of the cage. The view of the incident is partially obscured by the bodies of the guards and the angle at which the camera is held. However, the recording does show that both Defendants King and Blaker had their hands on Plaintiff. It also does not show any apparent aggressive behavior on the part of Plaintiff that would justify his initial rough treatment, nor does it show that Plaintiff was given any orders by the officers, either prior to the use of force, or after its initiation.

At this point on the video, a brief verbal exchange takes place between Plaintiff and Defendants Blaker and King. Plaintiff, in a soft voice, makes a partially inaudible statement ending in ". . . what you're supposed to do." One of the officers responds, "Exactly . . . [*inaudible*] . . . exactly what the fuck I'm supposed to do." As this verbal exchange occurs, the camera angle lowers, and Plaintiff is almost entirely obscured by the body of one of the Defendants. The dialogue continues regarding Plaintiff's glasses,[4] and lasts until 19:15:10, when the video abruptly cuts to 19:15:55, at which point Plaintiff is being taken off of the bus.

Plaintiff was examined by medical personal on the day of the incident. It is undisputed that Plaintiff suffered abrasions on his upper forehead and left side of his nose, as well as a three-centimeter long laceration inside his lip. (Doc. 65) ¶ 30. Plaintiff notes that the medical records also show that he suffered a contusion to the posterior left occipital area of his head, and injuries to his shin and right ribcage. Id. Plaintiff suffered no fractures to his skull or facial bones. Id. ¶ 34.

---

[4] It is undisputed that Plaintiff's glasses were broken while he was on the bus. However, SCI-Greene paid to replace them. (Doc. 65) ¶ 26.

B.  **Analysis**

   1. **Section 1983 Conspiracy**

Plaintiff asserts that Defendants King and Grainey entered into a conspiracy to use excessive force against him. (Doc. 35) ¶ 29. Section 1983 does not create a cause of action for conspiracy in and of itself. Instead, on order to prevail, a plaintiff also must show some underlying deprivation of a constitutional right. Davis v. Wilson, No. 08-589, 2009 WL 688912, at *12 (W.D.Pa. Mar 12, 2009) (Hay, Mag.J.) (quoting Holt Cargo Systems, Inc. v. Delaware River Port Auth., 20 F.Supp.2d 803, 843 (E.D.Pa. 1998)); see also Hickson v. Marina Assoc.s, 743 F.Supp.2d 362, 377 n.22 (D.N.J. 2010) ("[t]he theory of conspiracy does not yield an independent cause of action under Section 1983, but instead presents merely a means to impute liability to other wrongdoers for violations of federal rights" (citing Revak v. Leiberum, No. 08-691, 2009 WL 1099187, at *2 (W.D.Pa. Apr. 23, 2009) (Ambrose, C.J.)).

Based on this Court's prior analysis regarding Defendant King's alleged assault of Plaintiff, it is clear that a triable issue of fact exists as to whether Defendant King violated Plaintiff's rights under the Eighth Amendment by means of the use of excessive force. See (Doc. 71) at 8 – 9. It is thus necessary for this Court to determine whether Plaintiff has adduced sufficient evidence that a reasonable trier of fact could conclude that an agreement between Defendants King and Grainey existed with respect to that alleged use of excessive force. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

In support of his assertion that such an agreement existed, Plaintiff adduces two statements made by Defendant King. The first was made by Defendant King at his deposition, during which he testified that he was instructed by Defendant Grainey that, "[i]f [Plaintiff] gets out of hand, give him a good SCI-Greene welcome." (Doc. 65) ¶ II.7; see also (Doc. 58) at 30.

7

Defendant Grainey denies making such a statement. The second piece of evidence adduced by Plaintiff is Eperjesi's testimony at his deposition. (Doc. 65) ¶ II.10. This testimony relates how Defendant King purportedly told Eperjesi and another corrections officer at SCI-Greene – Lieutenant Grego – that he had been told by Defendant Grainey to "take care of business" and that he "knew what he was told to do." See (Doc. 65-1) at 7 – 8, 18, 20 – 22; see also (Doc. 58) at 67, 70.

Defendant Grainey objects to the admissibility of the above statements as hearsay. (Doc. 69). Plaintiff has failed to respond to those objections.

The Federal Rules of Evidence generally prohibit the admission of hearsay statements at trial. Fed.R.Evid 802. However, there are certain specifically defined exceptions to this general rule. For example, under certain circumstances, statements that would otherwise be defined as hearsay are excluded from its definition, such as when "a statement [is made] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). While this particular rule would seem, intuitively, to provide a vehicle for the admission of Defendant King's statements with respect to Defendant Grainey, these statements were made well after any alleged conspiracy to assault Plaintiff had run its course – and thus not "during the course and in furtherance of" the alleged conspiracy. As such, they are clearly not excluded from the definition of hearsay by Rule 802(d)(2)(E).

Instead, for the reasons stated below, Rule 801(d)(2)(A) – which excludes from the definition of hearsay "[a] statement [that] is offered against a party and is . . . the party's own statement" – appears to offer a proper basis for admitting Defendant King's communication, during his deposition testimony, of Defendant Grainey's alleged statement. Fed.R.Evid. 801(d)(2)(A).

8

Defendant Grainey does not appear to contend that Defendant King's deposition testimony would be contrary to his position that no conspiracy to violate Plaintiff's constitutional rights existed. Instead, he argues that the above statement cannot be admitted against him because he and Defendant King are both on the same side of this litigation.[5] (Doc. 69) at 5-6. In support of this, he relies on Stalbosky v. Belew, 205 F.3d 890 (6th Cir. 2000). The sad facts of that case involved William Belew, a truck driver and employee of Three Rivers Trucking Company, who, while driving for Three Rivers, raped and murdered Myra Stalbosky in his truck. The victim's estate brought suit against Belew and Three Rivers, alleging, *inter alia*, that Three Rivers had negligently hired and retained Belew. As evidence in support of this claim, that plaintiff submitted the affidavit of a private investigator, in which it was communicated that Belew had stated that the owners of Three Rivers knew of his prior criminal record, but told him not to worry about it. The district court refused to admit the private investigator's affidavit as evidence against Three Rivers, finding it to be hearsay.

In affirming the holding of the district court, the Court of Appeals for the Sixth Circuit wrote:

> On appeal, [the plaintiff] argues that [the private investigator's] statement was admissible under Rule 801(d)(2) of the Federal Rules of Evidence as an admission by Belew, a party-opponent. Belew is a party to this action, but the statements that are at issue here were not offered against Belew, but rather against Three Rivers to establish its knowledge of Belew's prior criminal history. Under Rule 801(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against that party. The district court therefore properly refused to consider [the private investigator's] affidavit.

---

[5] This argument is somewhat at odds with those made later in the same paragraph, in which Defendant Grainey asserts that "[a]dverse interests the [sic] manifestly exist between [Defendants King and Grainey]" preclude admissibility of Defendant King's statements under the agency exception to the hearsay rule. (Doc. 69) at 6; see also Fed.R.Evid. 801(d)(2)(D).

9

295 F.3d at 894.

This logic appears to preclude the admittance, under Rule 802(d)(2), of Eperjesi's deposition testimony and report regarding what Defendant King said with respect to Defendant Grainey's alleged statements.[6] However, Defendant King's testimony at his deposition concerning Defendant Grainey's alleged direction to "give [Plaintiff] a good SCI-Greene welcome" is not precluded by such an analysis.[7] To the contrary, Defendant King was merely the witness to these alleged statements. See United States v. Palow, 777 F.2d 52, 56 (1st Cir. 1985) (testimony from one defendant regarding the statements of another during a conspiracy were properly admitted; admission must only be adverse to defendants' position at trial, and need not be elicited through government witnesses). This Court recognizes that some conflicting authority exists between the circuits on this issue. See 5 Jack B. Weinstein & Margaret A. Berber, Weinstein's Federal Evidence, §801.30[1] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2011). Nevertheless, as it is apparent that (1) this admission was allegedly made by Defendant Grainey; (2) it is being offered by the Plaintiff against Defendant Grainey; and (3) Defendant King merely was a witness to it, the undersigned is persuaded that Defendant King's

---

[6] Plaintiff has not made any argument regarding why Eperjesi's deposition testimony and underlying report may or may not be admissible against Defendant Grainey – despite his burden to do so once Defendant Grainey objected to their admissibility. Be that as it may, given our finding that Defendant King's deposition testimony is admissible against Defendant Grainey, and that enough evidence exists without Eperjesi's testimony and report to survive summary judgment, it is unnecessary to resolve the issue of Eperjesi's testimony and report in this opinion.

[7] This conclusion is supported by the holding of the court of appeals in Stalbosky itself. That court determined that the private investigator's affidavit relating Belew's statement would have been admissible against Belew, but not against Three Rivers, as it was not, ultimately, their statement that was being related in the affidavit. 205 F.3d at 894. Here, Defendant King's deposition testimony clearly relates a statement allegedly made by Defendant Grainey.

direct relation of Defendant Grainey's alleged statement during his deposition would be admissible at trial under Rule 801(d)(2)(A).

Defendant Grainey further argues that Defendant King's communication of his alleged statement alone is insufficient to prove the existence of a conspiracy. (Doc. 69) at 3. In support of this, Defendant Grainey relies on a provision of Federal Rules of Evidence, in which it is explicitly stated that "[t]he contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E)." Fed.R.Evid. 801(d)(2).

Plaintiff contends that a reasonable jury may conclude that a conspiracy between these two Defendants existed based not only on Defendant Graney's alleged statement, but also on the context of the conversation, Defendant Graney's superior rank, the fact that Defendant Grainey left the scene prior to the use of force, and Defendant King's subsequent actions.[8] (Doc. 64) at 12-13. The Court of Appeals for the Third Circuit has recognized that "[t]he timing and circumstances of a meeting or a series of meetings may be sufficiently suspicious to permit a reasonable inference of complicity in the . . . enterprise." United States v. Ammar, 714 F.2d 238, 250 (3d Cir. 1983). Given this standard, and viewing all evidence in the light most favorable to the Plaintiff, this Court finds Defendant Grainey's argument to be unpersuasive.

Finally, Defendant Grainey argues that his alleged statement, on its merits, is not sufficient evidence of the existence of a conspiracy between him and Defendant King to allow the claim to survive summary judgment. First, he contends that the alleged statement, which he

---

[8] The undersigned notes that the utterance of "[e]xactly . . . [*inaudible*] . . . exactly what the fuck I'm supposed to do." during the course of the use of force, if attributable to Defendant King, would further support the conclusion that a conspiracy existed.

11

denies having made, is so ambiguous that it could support either side of this litigation, and thus cannot qualify as proper evidence of the existence of an agreement between the two men to violate Plaintiff's constitutional rights. (Doc. 68) at 7, 9-10. He also asserts that, at worst, his alleged statement was a threat conditioned upon Plaintiff's "get[ting] out of line," which, under the principles of tort law, does not support a claim for relief. Id. at 10-11. However, when viewed in the light most favorable to Plaintiff, and in connection with the other evidence adduced by Plaintiff and mentioned above, a statement such as "[i]f [Plaintiff] gets out of hand, give him a good SCI-Greene welcome" is hardly as ambiguous as Defendant Grainey contends. This is especially true in light of the fact that Plaintiff has adduced strong evidence, in the form of a video recording, supporting his allegation that he was the victim of excessive force at the hands of Defendants, and that someone on the video was doing "exactly what . . . [he was] supposed to do." At the very least, triable issues of fact exist with respect to whether the statement was actually made by Defendant Grainey and, if so, whether he intended it to indicate his willingness to enter into an agreement with Defendant King to violate Plaintiff's rights under the Eighth Amendment.

Accordingly, Defendant Grainey's motion for summary judgment will be denied.

AND NOW, this 22nd day of August, 2011,

IT IS HEREBY ORDERED that the motion for summary judgment filed by Defendant Grainey (Doc. 60) is DENIED.

s/Cathy Bissoon<br>
CATHY BISSOON<br>
UNITED STATES MAGISTRATE JUDGE